UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

BANCO DEL ATLANTICO, S.A. (In          )
Liquidation), and HSBC MEXICO, S.A.,   )
       Plaintiffs,                     )
                                       )
    vs.                                    )          1:03-cv-1342-LJM-VSS
                                       )
ALFRED MAX STAUDER, *et al.*,          )
       Defendants.                     )

### ENTRY REGARDING DEFENDANTS' MOTIONS TO DISMISS SECOND AMENDED COMPLAINT

      This cause is before the Court on four separate motions to dismiss part or all of the Second Amended Complaint ("SAC").[1]  Plaintiffs', Banco Del Atlantico, S.A. ("Atlantico"), and HSBC Mexico, S.A., SAC names more than twenty defendants, consists of 109 pages (exclusive of exhibits), 285 paragraphs, and twelve counts.  The Court's role in deciding the current motions to dismiss is to determine whether Atlantico's claims are viable and therefore provide this Court with federal jurisdiction over this matter.

      For the reasons stated herein, the Court **GRANTS** in part and **DENIES** in part Defendants' motions to dismiss.

## I. INTRODUCTION

      The Defendants who have appeared in this action fall into three general groups: the "Pentland Defendants," who are Pentland Group plc (n/k/a Pentland Brands plc), Pentland USA, Inc., Finchside International, Ltd., Nahum G. Shar, and David Alan Bernstein; the "Stauder

---

    [1] In addition to a Joint Motion to Dismiss, individual Motions to Dismiss were filed by three general groups of defendants.  The Court shall address the joint motion, then the individual motions, in turn.

Defendants," who are Alfred Max Stauder, Deanna J. Stauder, David A. Felts, Anonymous II, Inc. (f/k/a Woods Wire I, Inc.), Longwood Industries, Inc., Pacintrex U.S.C.A., Inc., and International Trade Specialists, Inc.; and "Woods," which is Woods Industries, Inc (also referred to as "Woods II").

Atlantico, a defunct Mexican bank, whose valuable assets have been sold to a subsidiary of Hong Kong-based HSBC bank, seeks to recover approximately $12.5 million in bad loans extended to Corelmex, a Mexican corporation. Atlantico provided credit and loans to Corelmex for about six years, from May 1987 through 1993. During this six-year period, Plaintiffs claim that Corelmex provided Atlantico with false financial statements that inflated Corelmex's value, and that Corelmex was secretly diverting funds to more than fifteen Mexican companies that were "affiliated with" Corelmex. Plaintiffs further claim that Atlantico was induced to make additional loans to Corelmex based on guarantees executed by another company owned by Woods Wire I. Woods Wire I provided its last guarantee to Atlantico on November 29, 1989. Plaintiffs further claim that the Woods Wire I guarantees were fraudulent because Woods Wire I made them with no intention of honoring them.

In January 1993, Corelmex declared bankruptcy. Atlantico alleges that the bankruptcy was corrupt, and complains that it lost the entire amount of its loans to Corelmex under Mexican bankruptcy law. Plaintiffs call the foregoing chain of events the Corelmex "bust out," and assert a variety of fraud, RICO, and other claims based on the "bust out."

## II. BACKGROUND

On February 26, 1986, Alfred Max Stauder ("Stauder"), David A. Felts ("Felts"), and Mario Cruz-Prieto Perez ("Cruz-Prieto") founded Corelmex. SAC ¶ 36. Corelmex was to become a

supplier to Woods Wire I, a manufacturer of electrical goods based in Carmel, Indiana. *Id.* Stauder, Felts, and Cruz-Prieto described Corelmex as a "twin-plant" or "satellite" for Woods Wire I to Atlantico. *Id.* ¶¶ 35-37. At all relevant times, Woods Wire I was owned by Stauder, Deanna Stauder ("Mrs. Stauder"), and Felts. *Id.* ¶¶ 12, 14, 21. Felts served as President and Chief Financial Officer of Woods Wire I at all relevant times. *Id.* ¶ 14.

On or about May 20, 1987, Atlantico executed its first credit agreement with Corelmex, which purportedly included a $300,000 loan. *Id.* ¶ 38. On June 15, 1988, Atlantico increased Corelmex's line of credit to $5.6 million *Id.* ¶ 50. On June 20, 1988, Woods Wire I provided a guarantee to Atlantico for approximately $1.3 million. *Id.* On July 16, 1988, Woods Wire I provided a second guarantee to Atlantico for $870,000 U.S. and $6 million *Id.* On November 29, 1989, Woods Wire I provided a third guarantee to Atlantico for $11 million *Id.* ¶ 55. On December 8, 1989, Atlantico approved additional credits and financing for Corelmex's pre-export and export sales in the amount of $10 million. *Id.* ¶ 56.

Atlantico representatives visited Woods Wire I from October 29 to November 2, 1990. *Id.* ¶ 60-61. During this visit, Stauder reiterated that Woods Wire I would stand behind any loans to Corelmex. *Id.* ¶ 62. Plaintiffs allege that Woods Wire I, Felts, and Stauder intended that Woods Wire I would deny that the foregoing guarantees were enforceable and would attempt to prevent Atlantico from enforcing them or recovering upon them. *Id.* ¶ 57.

Corelmex, through Cruz-Prieto, provided Atlantico with several false financial statements during the course of their business relationship. *See, e.g., id.* ¶¶ 54, 65-67. Stauder and Felts made false statements to Atlantico regarding various operating plans between Corelmex and Woods Wire I. *See, e.g., id.* ¶¶ 54, 69-70.

On January 23, 1991, Atlantico restructured its prior loans to Corelmex into a long term debt in the amount of $7 million U.S. to be paid over a period of seven years. *Id*. ¶ 67. On February 6, 1992, Atlantico authorized an additional $4.5 million line of credit for Corelmex. *Id*. ¶ 74. On January 19, 1993, Corelmex declared bankruptcy. *Id*. ¶ 130.

The Stauder defendants (including Woods Wire I), met the Pentland Defendants in 1991, more than a year after Woods Wire I extended its last alleged guarantee to Atlantico on behalf of Corelmex. *Id*. ¶ 82. The Pentland Defendants learned of the Woods Wire I guarantees in 1992. *Id*. ¶¶ 87, 98.

On March 6, 1993, Woods Wire I sold certain of its assets to Woods II. *Id*. ¶ 114. Assets and liabilities relating to the Woods Wire I guarantees were not transferred. *Id*. ¶ 5, 113. The price was approximately $40 million U.S. in cash and debt relief. *Id*. ¶ 114. At all relevant times, Pentland USA owned most or all of Woods II. *Id*. ¶¶ 83, 115, 167, 172-76. Atlantico alleges that the March 1993 Woods Wire I to Woods II asset sale was a fraudulent transfer because it did not leave Woods Wire I with sufficient assets to pay off its guarantees to Atlantico. *Id*. ¶¶ 113-15, 248. Atlantico asserts that Woods Wire I and Woods II each is liable for Corelmex's total alleged debt to Atlantico of approximately $12.5 million U.S. based on the three Woods Wire I guarantees. *Id*. ¶¶ 283, 285. Atlantico first requested payment from Woods Wire I on the guarantees in August 10, 1993, several months after the sale of Woods Wire I assets to Woods II. *Id*. ¶ 154.

Plaintiffs allege that Corelmex is a RICO enterprise. *Id*. ¶ 192. Plaintiffs also allege a second, alternative association-in-fact enterprise involving all defendants. *Id*. The SAC alleges as follows:

At the outset, Stauder was in charge of Corelmex and the mastermind and leader of

4

the association-in-fact and Cruz-Prieto and Felts, among others who are not defendants, were his lieutenants and were directly supervised by him. Stauder also directed and controlled Woods Wire I, Longwood, ITS and Pacintrex USA. Pacheco and Rojas became Stauder's lieutenants, joined the association and acted as his and Woods Wire's agents. When the Pentland Defendants took over Woods Wire and with it, ultimate control of Corelmex, Bernstein, Shar, Pentland plc, Pentland USA and Finchside knew of the frauds in which Corelmex engaged and became full fledged members of the association. Stauder's direction and control was extended to Woods Wire II ["Woods"], subject to the oversight and supervision of Bernstein, Shar and the other officials of Pentland plc, Pentland USA and Finchside designated to do so. Stauder consulted with Bernstein, Shar and Charlton and obtained their approval or other directions for his and Woods Wire II's ["Woods'"] conduct of the enterprise. They also kept themselves informed by other means and made changes as they saw fit, including, among other things, imposing restrictions on the manner in which he and the enterprise carried on various activities, particularly with respect to the disclosure of the diversion of payments, supposedly paid to Corelmex.

*Id*. ¶ 194.

# II. <u>STANDARDS</u>

Individual Defendants seek to dismiss various Counts under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") for failure to state a claim upon which relief can be granted. When ruling on a motion to dismiss for failure to state a claim, pursuant to Rule 12(b)(6), the Court accepts as true all well-pleaded factual allegations in the SAC and the inferences reasonably drawn from them. *See Baxter by Baxter v. Vigo County Sch. Corp.*, 26 F.3d 728, 730 (7th Cir. 1994). The Court can consider the facts alleged in the SAC as well as documents attached to or incorporated into a complaint when reviewing under a motion to dismiss standard. *See Albany Bank & Trust Co., v. Exxon Mobil Corp.*, 310 F.3d 969, 971 (7th Cir. 2002). Dismissal is appropriate only if it appears beyond doubt that plaintiff can prove no set of facts consistent with the allegations in the complaint that would entitle it to relief. *See Hi-Lite Prods. Co. v. Am. Home Prods. Corp.*, 11 F.3d 1402, 1405

(7th Cir. 1993). This standard means that if any set of facts, even hypothesized facts, could be proven consistent with the complaint, then the complaint must not be dismissed. *See Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1995).

Defendants also move to dismiss various counts of the SAC for failure to comport with Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"). A Plaintiff is "not required to plead the particulars of [its] claim[s]," *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774 (7th Cir. 1994), except in cases alleging fraud or mistake where plaintiffs must plead the circumstances constituting such fraud or mistake with particularity. *See* Fed. R. Civ. P. 9(b); *Hammes*, 33 F.3d at 778. "Particularity" requires plaintiffs to plead the who, what, when, where, and how of the alleged fraud. *See Ackerman v. N.W. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999); *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990). Allegations of fraud in a civil RICO complaint are subject to the heightened pleading standard of Fed.R.Civ.P. 9(b). *See Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 726 (7th Cir. 1998). Finally, the Court need not ignore facts set out in the complaint that undermine Plaintiff's claims, *see Homeyer v. Stanley Tulchin Assoc.*, 91 F.3d 959, 961 (7th Cir. 1996) (*citing Am. Nurses' Ass'n v. State of Illinois*, 783 F.2d 716, 724 (7th Cir. 1986)), nor is the Court required to accept Plaintiff's legal conclusions. *See Reed v. City of Chicago*, 77 F.3d 1049, 1051 (7th Cir. 1996); *Gray v. Dane County*, 854 F.2d 179, 182 (7th Cir. 1988).

## III. DISCUSSION

### A.  DEFENDANTS' JOINT MOTION TO DISMISS

#### 1.  Fraud Claims Based on the Woods Wire I Guarantees

##### a.  Common Law Fraud - Count X

In essence, Atlantico alleges that Woods Wire I defrauded it by promising to guarantee Corelmex's debt and then failing to perform on that promise.  However, Indiana law does not recognize a claim for fraud based on a promise of future conduct, i.e. promissory fraud.  *See Simon Property Group, L.P. v. mySimon, Inc.*, IP 99-1195, 2000 WL 1206575, at *2 (S.D. Ind. Aug. 3, 2000) ("'actionable fraud cannot be predicated upon a promise to do a thing in the future, although there may be no intention of fulfilling the promise.'") (quoting *Sachs v. Blewett*, 185 N.E. 856, 858 (Ind. 1933) and citing *Wright-Moore Corp. v. Ricoh Corp.*, 908 F.2d 128, 141 (7th Cir. 1990); *Vaughn v. General Foods Corp.*, 797 F.2d 1403, 1412 (7th Cir. 1986)).  As a a matter of law, Plaintiffs have no fraud claims based on the alleged Woods Wire I guarantees under Indiana law.

Plaintiffs, in response, argue that the SAC does not allege an action for fraud merely on a promise to be performed in the future, but a fraudulent scheme including false statements concerning the financial state of Corelmex, the relations between Woods Wire I and Corelmex, and Woods Wire I's plans for Corelmex that existed at the time and prior to when the statements were made.  *See* Pl.'s Resp. Br. at 16.  A review of Appendices B-D of the SAC, summarizing the alleged predicate acts constituting various forms of fraud, yields twelve representations by Woods Wire I.  However, of those twelve alleged representations, only one was made to Atlantico.  *See* SAC ¶ 38.  That paragraph alleges that "on July 21, 1987[,] the agreement for the financing of [a $300,000 loan from Atlantico to Corelmex] was publicly filed showing it to be secured by a mortgage on the Corelmex

7

industrial unit (i.e. its machinery and equipment) *and a guarantee letter from Woods Wire [I]*." *Id.* (emphasis added). According to this paragraph, Woods Wire I executed a guarantee of the Corelmex debt, yet no misrepresentation is alleged.

Various other paragraphs purport to show that Woods Wire I made false statements to other parties that were later forwarded to Atlantico or other lenders. *See* SAC ¶¶ 55, 64, 68. Conspicuously absent, however, are allegations of misrepresentation. The SAC alleges that Woods Wire I fraudulently induced Atlantico to issue loans in paragraph 58, but this paragraph fails to include a representation of material fact by Woods Wire I to Plaintiffs. Instead, it alleges that Cruz-Prieto invited several bank officers to travel to Indiana at Woods Wire I's expense to tour its facilities to demonstrate the financial stability of Woods Wire I in an effort to assure Confia (another lender) that any loans to Corelmex would be safe. *See id.* The Court cannot identify any misrepresentation by Woods Wire I to Atlantico of any past or existing material fact.

Plaintiffs also argue that the SAC's promissory fraud claims involve "representation[s] that a certain course of events will yield a specific result;" "a false representation of existing legal obligations;" and / or "constructive fraud." Pl.'s Resp. Br. at 16-18.

First, Plaintiffs cite two Indiana Appellate Court decisions for the proposition that their "guarantee fraud" claims are cognizable under Indiana law because they concern a false representation regarding a "present fact" or "certain course of events." *Id.* at 16-18 (citing *Hartman v. Int'l Build. & Loan Ass'n.*, 62 N.E. 64 (Ind. Ct. App. 1901); *R.R.S. II Enterprises, Inc. v. Regency Assocs.*, 646 N.E.2d 56 (Ind. App. 1995)). However, these cases do not alter the Indiana Supreme Court's rule articulated in *Sachs* that actionable fraud cannot be predicated upon a promise to do a thing in the future. In fact, the *Regency* court specifically acknowledged that a misrepresentation of

8

intent cannot support a fraud claim.  *See Regency*, 646 N.E.2d at 59.  The 1901 ruling in *Hartman* was decided well before *Sachs*, and does not negate it.  *See Hartman*, 62 N.E. 64.  These cases are also inapposite to the present dispute.  Both *Regency* and *Hartman* involved fraudulent factual statements that induced the execution of a contract; not, as claimed here, the alleged execution of a contract with the intent not to perform.  Indeed, the present "fact" or "event" that Woods Wire I is purported to have misrepresented is its "intent" to perform on the alleged guarantees at a future date.  *See, e.g.*, SAC ¶ 57.

Second, characterizing the Woods Wire I guarantees as "legal obligations" does not support different treatment under Indiana law.  Plaintiffs cite no law in support of the proposition that some contracts are governed by the *Sachs*' rule, but others that embody "legal obligations" are not.

Finally, Plaintiffs ask the Court to consider their claims as "constructive fraud."  However, Plaintiffs concede that there was no "confidential relationship" between Woods Wire I and Atlantico, which is generally required for such a claim; nor do the allegations of the SAC support constructive fraud claims.  *See* Pl.'s Resp. Br. at 17 n. 14.

Plaintiffs cite several Indiana Appellate Court cases for the proposition that an action for "constructive fraud" may lie where the parties are in a buyer-seller relationship or where one party has undue power over the other, and the seller makes "unqualified statements in order to induce another to make a purchase" or take some other action.  *See id.* (citing *Scott v. Bodor, Inc.*, 571 N.E.2d 313, 324 (Ind. Ct. App. 1991); *McDaniel v. Shepard*, 577 N.E.2d 239, 242 (Ind. Ct. App. 1991)).  However, there exists no allegation in the SAC that Woods Wire I and Atlantico were in a buyer-seller relationship, or that Woods Wire I had any undue power over Atlantico.

For the aforementioned reasons, the Court **GRANTS** Defendants' motion to dismiss with

prejudice Count X against all defendants, to the extent that such claims are based upon guarantees executed by Woods Wire I in 1988 and 1989 for Corelmex debt.

### b. Federal Fraud Claims

In order to sustain mail or wire fraud claims based upon the Woods Wire I guarantees, Plaintiffs must plead Woods Wire I's "'(1) participation in a scheme to defraud; (2) commission of the act with intent to defraud; and (3) use of the mails [or interstate wire communication systems] in furtherance of the fraudulent scheme.'" *Williams v. Aztar Indian Gaming Corp.*, 351 F.3d 294, 298-99 (7th Cir. 2003) (quotations and citations omitted). A necessary element of a scheme to defraud is the making of a false statement or material misrepresentation, or the concealment of a material fact. *See Neder v. United States*, 527 U.S. 1, 25 (1999); *United States v. Tadros*, 310 F.3d 999, 1006 (7th Cir. 2002)

Defendants argue that Plaintiffs failed to plead (1) that Woods Wire I "participated in" and "furthered" a scheme to defraud Atlantico by sending the Woods Wire I guarantees, and that (2) Woods Wire I intended to defraud Atlantico by providing the guarantees. Plaintiffs must plead, with particularity, that a letter or fax was sent as a part of and in furtherance of a scheme to defraud by the sender of the letter or fax. *See McDonald v. Schencker*, 18 F.3d 491, 493-94 (7th Cir. 1994). Defendants argue that the SAC does not allege this necessary link between the scheme to defraud and the transmission by Woods Wire I. To the contrary, SAC paragraphs 196-97 explicitly allege that transmission of the guarantees to Atlantico and other banks were in furtherance of a scheme to defraud.

The Court next addresses Defendants' argument that Plaintiffs failed to plead

contemporaneous fraudulent intent.  To survive the pleading stage, a claimant must be able to point to specific, objective manifestations of fraudulent intent.  *See Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir. 1992) (internal quotations and citations omitted).  In their response, Plaintiffs identify twenty-three paragraphs of the SAC that purportedly plead "specific, objective manifestations" of Woods Wire I's contemporaneous fraudulent intent.  *See* Pl.'s Resp. at 23 (citing SAC ¶¶ 57, 65-67, 71-81, 104-108, 110-11, 119).  However, these paragraphs do not contain such a showing.  The majority of these paragraphs overwhelmingly concern events that allegedly occurred after 1990, which, as a matter of law, cannot show that Woods Wire I intended to defraud Atlantico (or anyone else) when it extended guarantees in 1988 and 1989.  The other cited paragraphs either do not constitute a representation by Woods Wire I, or contain bald statements of wrongful intent.

Paragraph 57 is a conclusory statement of fraudulent intent, and is inadequate as a matter of law to sustain Plaintiffs' claims.  Paragraphs 65-66 concern financial statements made to Atlantico by Cruz-Prieto, not Woods Wire I.  Paragraph 67 concerns alleged diversions by Corelmex to its subsidiaries and affiliates.  However, it is not alleged that these subsidiaries were owned or in any way controlled by Woods Wire I.  The events in paragraphs 71-81, 104-07, 110-11, and 119 allege events that occurred well after the guarantees were executed.  Paragraph 108 concerns alleged overextensions of credit by Woods Wire I to Corelmex, most of which allegedly occurred after the guarantees were executed.  Finally, many of the allegations in the SAC referenced in Plaintiffs' response have no conceivable connection to an alleged "scheme to defraud," such as a 1992 customs violation and alleged events occurring in 1993, well after Atlantico stopped loaning money to Corelmex.  *See* SAC ¶¶ 110-11, 119.

Defendants also assert that the sale of assets from Woods Wire I to Woods II in 1993 does

not support fraud claims based on Woods Wire I's extension of guarantees to Atlantico in 1988 and 1989. Clearly, the sale occurred well after the guarantees were executed. Plaintiffs respond that the SAC does not allege that Woods Wire I possessed the intent to fraudulently sell all of its assets to Pentland at the time it executed the guarantees. Instead, they allege that "at the time the guarantees were executed, Woods I possessed the intent to funnel funds out of a credit vehicle, i.e., Corelmex, and that Woods Wire I itself was engaged in its own frauds." Pl.'s Resp. Br. at 23. More specifically, Plaintiffs argue that the sale of assets for inadequate consideration in a transaction designed to leave the debtor insolvent, divert consideration to and otherwise benefit the debtor's shareholders, while attempting to leave certain creditors empty-handed, reflects the intent to hinder creditors, and thereby constitutes fraud. *See id.* at 23-24 (citing *U.S. v. Denlinger*, 982 F.2d 233, 236 (7th Cir. 1992)); SAC ¶¶ 113, 117. However, the 1993 asset sale is not germane to Plaintiffs' fraud claims based on the guarantees because the sale of assets occurred to a party unknown when the guarantees were executed, and because Plaintiffs do not assert that Defendants intended to make such a sale at the time of execution,.

The Court **GRANTS** Defendants' motion to dismiss with prejudice all remaining fraud and fraud-based counts as to all defendants, to the extent that they are based on guarantees executed by Woods Wire I in 1988 and 1989 for Corelmex debt.

## 2. RICO Claims - Counts I-VI, VIII

RICO's civil liability provision, 18 U.S.C. § 1964, imposes civil liability upon those who engage in certain "protected activities" set forth in 18 U.S.C. § 1962. Each prohibited activity in RICO "include[s], as one necessary element, proof of a 'pattern of racketeering activity.'" *H.J. Inc.*

12

*v. N.W. Bell Tel. Co.*, 492 U.S. 228, 229 (1989) (quoting 18 U.S.C. § 1962). In order to establish

a pattern of racketeering activity, it is necessary to show the existence of at least two predicate acts

of racketeering activity. 18 U.S.C. § 1961(g). The acts that can serve as predicates are set forth in

18 U.S.C. § 1961(1), and include mail fraud, wire fraud, and bank fraud, as those crimes are defined

by 18 U.S.C. §§ 1341, 1343 and 1344.

The "first rule" of pleading a RICO claim is that the "plaintiff must identify the enterprise."

*Jennings v. Emry*, 910 F.2d 1434, 1439-40 (7th Cir. 1990). *See also Stachon v. United Consumers*

*Club, Inc.*, 229 F.3d 673, 675 (7th Cir. 2000) (citing *Richmond v. Nationwide Cassel L.P.*, 52 F.3d

640, 645 (7th Cir. 1995)). An "enterprise" under RICO includes "any individual, partnership,

corporation, association, or other legal entity, and any union or group of individuals associated in

fact although not a legal entity." 18 U.S.C. § 1961(4). A RICO enterprise can be formal or informal,

but there must be some type of organizational structure. *Stachon*, 229 F.3d at 675 (citing *Richmond*,

52 F.3d at 645).

A RICO enterprise is "more than a group of people who get together to commit a 'pattern of

racketeering activity.'" *Id*. Instead, a RICO enterprise must have "an ongoing 'structure' of persons

associated through time, joined in purpose, and organized in a manner amenable to hierarchical or

consensual decision making." *Id*. (quoting *Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir. 1990)).

A RICO defendant or "person" must also be "separate and distinct from the enterprise," *id*. at 676

n. 3 (citing *Richmond*, 52 F.3d at 646-47), because "liability depends on showing that the defendants

conducted or participated in the conduct of the enterprise's affairs, not just their own affairs, through

a pattern of racketeering activity." *Id*. (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)

(internal quotation marks omitted)). *See also Cedric Kushner Promotions, Ltd. v. King*, 533 U.S.

158, 161 (2001) ("to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name").  In addition, the organization must also have "structure and goals separate from the predicate acts themselves."  *See Stachon*, 229 F.3d at 675.

Taken as a whole, the SAC alleges that all of the Defendants acted with a single purpose: to defraud Atlantico by inducing it to lend money to Corelmex and then preventing Atlantico from recovering the money loaned, *see, e.g.*, SAC ¶¶ 1-6, yet no other goals of the supposed enterprise beyond the predicate acts in the SAC are alleged.[2]  Plaintiffs, in their response brief, seem to claim that the purpose of the association was not merely to defraud Atlantico by committing predicate acts, but also to "profit from the supply of products by Corelmex to [Woods Wire I] at low prices with little or no investment" and to "obtain funds for Corelmex operations and diversion to other uses by fraud and to prevent recovery of those funds."  Pl.'s Resp. Br. at 25.  However, this newly alleged purpose for the purported association-in-fact cannot rescue the SAC.

First, Plaintiffs' recharacterization of the association's purpose conflicts with the allegations in the SAC.  Plaintiffs repeatedly and consistently allege in the SAC that the primary purpose of the Defendants in forming the alleged association-in-fact was to carry out a scheme to defraud Atlantico by inducing it to lend to Corelmex and then to prevent Atlantico from recovering on those loans or

---

[2] Some courts have stated the test for "'whether an alleged enterprise has an ascertainable structure . . . [is] whether the enterprise would still exist when the predicate acts were removed from the question.'"  *Okaye (U.S.A.), Inc. v. Denne Indus., Inc.*, 2000 WL 1727785, *4 (N.D. Ill. 2000) (quoting *Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 349 (S.D.N.Y. 1998)).  In this case, if the alleged predicate acts are removed, there is nothing in the SAC to sustain the allegation of an ongoing, structured enterprise among the Defendants.

the Woods Wire I guarantees of the loans.  *See, e.g.,* SAC ¶¶ 1-6.[3]  The deficiency in Plaintiffs'

pleading is also apparent in their argument regarding the instant motions to dismiss.  In Plaintiffs'

response to Defendants' joint memorandum in support of their motion to dismiss, they assert that

the alleged common goal among the Defendants was to defraud creditors.[4]  In their response to the

Stauder Defendants' individual motion to dismiss, Plaintiffs' assert only that the "Defendants

informally associated to obtain money by fraud from Atlantico and others and to prevent the recovery

of that money."  Pl.'s Resp. Br. at 18.

Second, even if the Court were to accept Plaintiffs' recharacterization of the enterprise's

common purpose, Plaintiffs' newly-minted purpose to profit from their alleged fraudulent conduct

in inducing loans that would not be repaid can, in actuality, only be construed as another way of

saying that the common goal was to defraud Atlantico.  Plaintiffs have not met the separate purpose

requirement by emphasizing the alleged profit motives of the Defendants instead of the losses to

Atlantico.  This does not set forth a common purpose beyond the predicate acts alleged, but, rather,

an alternative method by which to defraud them.

---

[3]  In summarizing their claims, Plaintiffs stated that "[t]his case involves a prolonged, elaborate and sophisticated 'bust-out' fraud scheme" and that "[t]he scheme was designed to defraud Atlantico and other creditors of their property by attempting to and causing them to provide financing, make loans and extend credit to Corelmex and to forebear from enforcing their rights. . . ."  SAC ¶¶ 1-2.  According to Plaintiffs, the purpose of a "bust-out" scheme is to obtain financing with no intent to repay.

[4]  In attempting to refute characterization of the "common purpose" as limited to defrauding Atlantico, Plaintiffs assert only that the SAC makes clear that Atlantico was only one of the *many* creditors defrauded by the Defendants' bust-out scheme.  Pl.'s Resp. Br. at 25 (citing SAC ¶¶ 37, 58-59, 64, 68, 77, 89, 107-08, 113, 117, 165-66, 173-76, 179, 181, 189) (emphasis added).  However, this does not indicate that the members of the alleged association-in-fact had a common purpose outside of the predicate acts as set forth in the SAC.  Instead, it only implicates additional alleged victims of the predicate acts.

Plaintiffs have alleged some structure to the enterprise, namely the following: Stauder was the mastermind and leader of the association, and Cruz-Prieto and Felts were his lieutenants. SAC ¶ 194. Stauder directed and controlled Woods Wire I. Manuel I Pacheco Hinojosa ("Pacheco") became Stauder's lieutenant and his and an agent for Stauder, Woods Wire I and Woods II when he arranged for and controlled the sham bankruptcy. *See id.* ¶¶ 12, 100-01, 124, 130. When Pentland joined the scheme, they became part of the chain of command of the association and, again under Stauder's leadership, the association was extended to Woods II. *Id.* ¶¶ 111, 113. The association's acts were overseen and supervised by David Alan Bernstein ("Bernstein"), Nahum Shar ("Shar"), and other Woods II directors and officials of Pentland assigned to "this mission." *Id.* ¶¶ 118-19.

Despite pleading that Stauder was in charge with a couple of key figures serving directly beneath him, the SAC still lumps together the vast majority of the Defendants and does not set forth how the predicate acts were carried out under this "organizational structure." For example, in what ways are Mrs. Stauder, ITS, Pacintrex, Woods Wire I, and Longwood participants in the association-in-fact when by Plaintiffs' own general allegations, Stauder, Felts and Cruz-Prieto were the driving force behind the alleged illegal acts. Moreover, Plaintiffs' description of key figures as "lieutenants" of Stauder does not explain how Stauder exercised control over those persons in the same way that, for example, control would be exerted in the prototypical RICO enterprise. Plaintiffs' SAC claims that different individuals were in control or in leadership positions at different times, but Plaintiffs never identify what role each defendant played in the alleged enterprise. *See Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 732 (7th Cir. 1998). Accordingly, Plaintiffs' structural description of the enterprise is still insufficient. A "nebulous, open-ended description of the enterprise does not sufficiently identify" the enterprise itself. *See Richmond*, 52 F.3d at 645. The requirement that

16

RICO only applies to ongoing organizations with "structure and goals separate from the predicate acts themselves" is intended to limit the reach of RICO. *Stachon*, 229 F.3d at 675. Absent this limitation, every garden-variety conspiracy or fraud claim would be a RICO claim. *Fitzgerald*, 116 F.3d at 228. It is required that the Plaintiffs plead "structure *and goals*" separate from the alleged predicate acts. Plaintiffs have failed, particularly with respect to the latter.

The SAC is also deficient because it fails to properly allege "common interest" among the Defendants. The Seventh Circuit recently reiterated that alleging a "common interest" among members of an association-in-fact" is "an essential ingredient" of a RICO claim. *Baker v. IBP Inc.*, 357 F.3d 685, 691 (7th Cir. 2004) (citing *United States v. Turkette*, 452 U,S, 576, 583 (1981). A reading of the SAC reveals divergent goals and purposes among the Defendants during the period in which Defendants were allegedly an association-in-fact. For example, between 1991 and March 1993, when the Pentland Defendants were negotiating with Stauder and Felts to purchase Woods Wire I assets, the interests of the Pentland Defendants as the buyers, and Woods Wire I, Felts, and Stauder as sellers were adverse. SAC ¶¶ 82-104-23, 192. Plaintiffs concede that the purchase of Woods Wire I assets was heavily negotiated, spanning approximately a year and a half. *Id.* ¶¶ 82-104. Moreover, after the purchase of Woods Wire I assets and the creation of Woods II, the interests of Woods Wire I and Woods II were not aligned. Similarly, the interests of Felts and Stauder were different from those of Woods II and the Pentland Defendants as evidenced by the negotiated employment agreements with Stauder and Felts.[5] *See, e.g., id.* at ¶ 172. As separate business

---

[5] The examples provided herein demonstrating that Defendants had divergent interests and goals are merely illustrative and not exhaustive. The SAC lumps together dozens of individuals and entities, many of which are not alleged to have any relationship with each other and no common interests.

entities, each alleged association member had different goals, and '[w]ithout a difference between the defendant and the 'enterprise' there can be no violation of RICO." *Baker*, 357 F.3d at 691.

Plaintiffs have not alleged sufficient facts to demonstrate Defendants had a "common purpose of engaging in a course of conduct," *Turkette*, 452 U.S. at 583, and divergent goals among members of a purported association-in-fact is a "fatal problem" to a RICO claim, not something that can be tossed off as a minor quibble. *See Baker v. IBP, Inc.*, 357 F.3d 685, 691 (7th Cir. 2004)

Finally, in considering whether Defendants' alleged association-in-fact is a valid RICO enterprise, it is important to consider the original intent behind the RICO statute. "RICO was originally enacted 'in an attempt to eradicate organized, long-term criminal activity.'" *Mira v. Nuclear Measurements Corp.*, 107 F.3d 466, 473 (7th Cir. 1997) (quoting *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1019 (7th Cir. 1992)). The legislative history of the RICO statute makes clear "that RICO's major purpose was to attack the 'infiltration of organized crime and racketeering into legitimate organizations.'" *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (quoting S.Rep. No. 91-617, at 76). The Seventh Circuit has provided specific guidance as to the nature of the typical RICO enterprise.

> The prototypical RICO case is one in which a person bent on criminal activity seizes control of a previously legitimate firm and uses the firm's resources, contacts, facilities, and appearance of legitimacy to perpetuate more, and less easily discovered, criminal acts than he could do in his own person, that is, without channeling his criminal activities through the enterprise that he has taken over.

*Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 227 (7th Cir. 1997); see also *Bachman v. Bear, Stearns & Co., Inc.*, 178 F.3d 930, 932 (7th Cir. 1999) ("[A] prototypical RICO enterprise is a criminal gang not incorporated under the law of any state…."). The Seventh Circuit instructed that RICO should

not be applied "to situations absurdly remote from the concerns of the statute's framers," and the district court should "determine how close to the prototype the case before it is – how close, in other words, the family resemblance is between the prototypical case and the case at hand." *Id*. at 226-27.

The "association-in-fact" alleged in the SAC does not resemble the "prototypical RICO enterprise." Plaintiffs allege that Stauder, Felts, and Cruz-Prieto created Corelmex as a "credit vehicle" and used Woods Wire I to execute guarantees to induce Atlantico to extend loans that would never be repaid. SAC ¶¶ 1-2, 37-91. The association-in-fact allegations involve the collaboration of dozens of individuals and approximately twelve entities to execute the bust-out scheme, the purchase of Woods Wire I assets, and various other actions purportedly intended to prevent Atlantico from recovering on the Woods Wire I guarantees long after the loans were made. *See, e.g., id.* at ¶¶ 104-41. The Plaintiffs do not allege that the purported association-in-fact involved the "infiltration of organized crime and racketeering into legitimate organizations," nor do Plaintiffs allege a "prototypical" RICO enterprise. Moreover, Plaintiffs do not allege that any party "seize[d] control" of any entity that is allegedly part of the association-in-fact, *see Fitzgerald*, 116 F.3d at 227, in an effort to use a legitimate company for illicit purposes. *See* SAC ¶¶ 104-23.

In sum, despite 285 paragraphs, 109 pages, and two re-pleadings following two rounds of briefing, Plaintiffs have not alleged a valid RICO enterprise under Seventh Circuit jurisprudence. Accordingly, the Court **GRANTS** Defendants' motion to dismiss with prejudice Counts I-VI and

19

VIII[6]  as to all defendants.[7]

## B.  THE STAUDER DEFENDANTS' MOTION TO DISMISS

Stauder, Mrs. Stauder, Felts, Anonymous II, Inc. (f/k/a Woods Wire I, Inc.), Longwood Industries, Inc. ("Longwood"), Pacintrex U.S.A., Inc. ("Pacintrex"), and International Trade Specialists, Inc. ("ITS") (collectively the "Stauder Defendants"), seek dismissal of Plaintiffs' SAC for failure to state a cause of action upon which relief can be granted, pursuant to Rule 12(b)(6), and for failure to comply with Rule 9(b)'s requirement that fraud be stated with particularity.  As discussed, RICO Counts I-VI, VIII have been dismissed as to the Stauder Defendants, so most of the parties' arguments have been rendered moot.

### 1.  Fraudulent Transfers - Count VII

The Stauder Defendants argue that Plaintiffs failed to state a cause of action in Count VII of the SAC because they failed to identify any of the "badges of fraud" indicative of a fraudulent transfer under Indiana law, Indiana Code § 32-18-2-14(1).[8]  Count VII alleges three fraudulent

---

[6]  Count VIII of the SAC is a claim based on Indiana's RICO statute.  "Indiana RICO is patterned after federal RICO" and may be analyzed "jointly" with federal RICO.  *Yoder Grain, Inc. v. Antalis*, 722 N.E.2d 840, 845 (Ind. Ct. App. 2000).  As all of the federal RICO counts are dismissed, the corresponding portions of the Indiana RICO claim must also be dismissed.

[7]  Accordingly, the Court shall not address the litany of additional arguments raised by individual defendants challenging Plaintiffs' RICO counts.

[8]For purposes of showing that a conveyance of real estate was fraudulent, fraudulent intent may be inferred from various factors or "badges of fraud" present in a given transaction, including: (1) the transfer of property by a debtor during the pendency of a suit, (2) a transfer of property that renders the debtor insolvent or greatly reduces his estate, (3) a series of contemporaneous transactions which strip a debtor of all property available for execution, (4)

transfers.  First is the transfer of assets from Woods Wire I to Woods II for substantially less than full market value.  *See* SAC ¶¶ 249-50.  Second is that Longwood pledged the stock of its subsidiaries to Mrs. Stauder and Judith Felts.  Third, Stauder and Mrs. Stauder made two separate transfers to Willow Properties, LLC ("Willow") of valuable real property "for the purpose of defrauding Atlantico and hindering and delaying the recovery by Atlantico of what is owed to it."  SAC ¶¶ 252-53.

As noted in the Court's September 17, 2004, Order, Plaintiff's fraudulent transfer claims with regard to the transfer of real property from Stauder and Mrs. Stauder to Willow "are sufficient under the notice pleading standard of Federal Rule of Civil Procedure 8(a) and, where necessary under the heightened pleading standard of Federal Rule of Civil Procedure 9(b)."  Dkt. 150 at 7.

As to the transfer of assets from Woods Wire I to Woods II for substantially less than fair market value, and the transfer of Longwood subsidiary stock to Mrs. Stauder and Judith Felts, the Court likewise finds these allegations sufficient.  Atlantico is not required to prove anything at this point.  Whether Plaintiffs can show any of the "badges of fraud" to prove intent as a necessary element of a fraudulent transfer claim is not necessary to survive the instant motion to dismiss.

The Stauder Defendants' motion to dismiss Count VII is **DENIED**.

---

secret or hurried transactions not in the usual mode of doing business, (5) any transaction conducted in a manner differing from customary methods, (6) a transaction whereby the debtor retains benefits over the transferred property, (7) little or no consideration in return for the transfer, and (8) a transfer of property between family members. *See Med. and Prof. Collection Srvs., Inc. v. Bush*, 734 N.E.2d 626 (Ind. Ct. App. 2000); *Johnson v. Estate of Rayburn*, 587 N.E.2d 182, 186 (Ind. Ct. App. 1992) (quoting *Jones v. Central Nat'l Bank of St. Johns*, 547 N.E.2d 887, 889-890 (Ind. Ct. App. 1989)).

### 2. **Common Law Fraud - Count X**

Plaintiffs must identify and associate individual defendants with the specific instances of alleged conduct.  *See Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990).  Thus, the Plaintiffs' fraud claim can only extend to the Defendants who made affirmative misrepresentations of fact to Plaintiffs.  Although Plaintiffs assert that these misrepresentations are outlined in paragraphs 1-189, 192-211, 213, 247-53, 266 of the SAC, a reading of these paragraphs reveals that the only Stauder Defendants alleged to have made such misrepresentations to Plaintiffs and upon which Plaintiffs relied were Stauder, Felts, and Woods Wire I.

As there are no affirmative misrepresentations or allegations of fraudulent concealment by the remainder of the Stauder Defendants, the Court **GRANTS** the Stauder Defendants' motion to dismiss with prejudice Count X as to ITS, Mrs. Stauder, Pacintrex, and Longwood.  Plaintiffs may pursue their common law fraud claims against Stauder, Felts, and Woods Wire I only.[9]

### 3. **Indiana Crime Victims Act ("ICVA") - Count IX**

As discussed, Plaintiffs have nowhere cited a material representation by Mrs. Stauder, ITS, Longwood, or Pacintrex.  Plaintiffs argue that with respect to the alleged violation of Indiana Code § 35-43-5-4(8), "the SAC details Stauder's, Mrs. Stauder's, Felts', Woods [Wire] I's and Longwood's actions to conceal, encumber or transfer Woods [Wire] I's and Corelmex's property in furtherance of the scheme to defraud creditors."  Pl.'s Resp. Br. at 33.  Yet the Plaintiffs provide no citation to appropriate paragraphs of the SAC containing representations by each individual

---

[9]  But as noted in section III, fraud claims against Woods Wire I may not be based upon the guarantees.

defendant.  Plaintiffs do, however, set forth a number of material representations made by Stauder, Felts, and Woods Wire I that may constitute mail or wire fraud.  Accordingly, the Court **GRANTS** the Stauder Defendants' motion to dismiss with prejudice Count IX as to Mrs. Stauder, ITS, Longwood, and Pacintrex.

### 4.  <u>Civil Conspiracy - Count XI</u>

The Stauder Defendants argue that Plaintiffs' claim of civil conspiracy fails for the same reason that their fraud claim fails with regard to ITS, Pacintrex, Mrs. Stauder, and Longwood's involvement, because there are no allegations that these particular defendants were involved in the predicate acts beyond merely being controlled by Stauder, Felts, Cruz-Prieto, and Woods II.  The Court disagrees.  Plaintiffs have alleged, *inter alia*, that there was a single plan, the essential nature and general scope of which was known to each person who is to be held responsible for its consequences.  *See Cameo Convalescent Ctr., Inc. v. Senn*, 738 F.2d 836, 841 (7th Cir. 1984) (citation omitted).  An express agreement among all the conspirators is not a necessary element of a civil conspiracy.  *See id.*  Plaintiffs were only required to allege that there was a plan, which was known to the various defendants.  The SAC satisfies this standard.  Accordingly, the Stauder Defendants' motion to dismiss Count XI is **DENIED**.

### C.  WOODS' MOTION TO DISMISS

Defendant Woods Industries, Inc. ("Woods II") moved to dismiss Counts I-XII of Plaintiffs SAC pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), incorporating Defendants' Joint Motion to Dismiss.

Woods II seeks to have each of Plaintiffs' fraud and statutory claims dismissed, and dedicates the majority of its argument to challenging the RICO allegations, which, as noted above, have been dismissed as to all defendants.  Thus, the Court is left to address only Woods II's argument that Plaintiffs' civil conspiracy and ICVA claims must be dismissed.  However, Woods II's argument is limited by the depth of discussion addressing the RICO Counts.  The Court has not been presented with sufficient argument as to the non-RICO Counts and will therefore address these claims at a later stage of the litigation.

Accordingly, Woods' motion to dismiss all non-RICO Counts (Counts VII, IX, X, XI, XII is **DENIED**.

### D.  PENTLAND DEFENDANTS' MOTION TO DISMISS

Pentland Group plc (n/k/a Pentland Brands plc) ("Pentland plc"), Pentland USA, Inc. ("Pentland USA"), Finchside International, Ltd. ("Finchside"), Shar, and Bernstein (collectively the "Pentland Defendants"), move to dismiss the fraudulent transfer, fraud, and certain RICO claims against them.  As discussed, the RICO claims have been dismissed as to all defendants.

### 1.  Fraudulent Transfers - Count VII

Plaintiffs contend that the fraudulent transfer claim "compl[ies] with the pleading requirements under the Federal Rules" because it contains much more detail than that contained in Federal Rule of Civil Procedure Form 13.[10]  The Pentland Defendants do not contend that Plaintiffs'

---

[10]  Official Form 13 provides in pertinent part: "Defendant C.D. on or about _____ conveyed all his property, real and personal [or specify and describe] to defendant E.F. for the purpose of defrauding the plaintiff and hindering and delaying the collection of the indebtedness

fraudulent transfer claim fails because it lacks sufficient detail, but, rather, because the SAC contains facts that specifically negated the relevant "badges of fraud." *See* n. 8.  The Pentland Defendants discuss a number of the SAC's allegations that would seemingly negate or undermine a number of the "badges of fraud," and seek dismissal because the allegations supposedly demonstrate that the Plaintiffs "can prove no set of facts in support of [their fraudulent transfer] claim which would entitle [them] to relief."  *See* Pentland Def.'s Rep. Br. at 2 (quoting *Looper Maint. Serv., Inc. v. City of Indianapolis*, 197 F.3d 908, 911 (7th Cir. 1999)).

The "badges of fraud," however, are designed to provide evidence of intent and are not required to be plead.  What the Pentland Defendants are asking the Court to do, is make a determination as to whether intent can be inferred from the various "badges of fraud," some of which undermine allegations in the SAC.  The Court will not make such a determination at this time.  In fact, the "badges of fraud" have nothing to do with the sufficiency of a pleading on a motion to dismiss.   Accordingly, the fraudulent transfer claim against the Pentland Defendants survives the instant motion to dismiss.  The Pentland Defendants' motion to dismiss Count VII is **DENIED**.

### 2. Common Law Fraud - Count X

The Pentland Defendants argue that Plaintiffs' fraud claim fails to state a claim for relief against any Pentland Defendant because Plaintiffs have failed to allege any specific misrepresentation that any Pentland Defendant made to Atlantico.  *See Rice v. Strunk*, 670 N.E.2d 1280, 1289 (Ind. 1996) (the first element of fraud requires "[a] material representation of past or existing facts by the party to be charged. . . .").

---

evidenced by the note referred to."  Fed. R. Civ. Pro. Form 13.

First, Plaintiffs assert an unsupported theory that the Pentland Defendants are liable for common law fraud in the absence of misrepresentations to Atlantico because the alleged fraud involved a complex scheme rather than "garden-variety" fraud. *See* Pl.'s Resp. at 21-22. However, this is not the law. In *Baxter v. I.S.T.A. Ins. Trust*, a plaintiff admitted that misrepresentations were not made to it, but nevertheless argued that "a fraud claim by a third person injured by deceit should be recognized in Indiana." 749 N.E.2d 47, 52 (Ind. Ct. App. 2001). The court squarely rejected that argument because of the lack of reliance by the plaintiff and the lack of direct communications to the plaintiff by the defendant. *Id. See also Doe v. Howe Military Sch.*, 227 F.3d 981, 990 (7th Cir. 2000) (one of "several problems" with the plaintiffs' fraud claim was that the defendants did not "personally misrepresent any facts to her"). This Court's decision in *Lycan v. Walters*, 904 F. Supp. 884 (S.D. Ind. 1995), also refutes the notion that the standard is somehow changed because it involved a complex scheme to defraud. *Lyncan* concerned a complex scheme to defraud, involving eleven defendants who allegedly defrauded several investors by inducing them to invest in a venture to acquire the assets of a bankrupt entity. *Id.* at 890-96. Despite a "complex scheme to defraud," this Court dismissed claims against those defendants who made no direct misrepresentations to plaintiffs. *Id.* at 897.

Alternatively, Plaintiffs argue (1) the Pentland Defendants *did* make misrepresentations directly to Atlantico by issuing an allegedly false press release and via Woods Wire I's attorney, David Kleiman ("Kleiman"); (2) that their claim for fraud is really a claim for constructive fraud; and (3) that the Pentland Defendants are liable for fraud under the principles of agency.

First, the Court disagrees with the contention that the 1993 press release announcing the Woods Wire I asset purchase was a fraudulent misrepresentation. The press release announced the

purchase of Woods Wire I, but the Plaintiffs did not identify any material misstatements of past or existing fact.  Plaintiffs claim that non-disclosure of certain alleged facts "render[ed] the press release false and misleading," but fail to explain why Pentland had a duty to disclose specific facts about the structure of the asset purchase in that press release.  Moreover, the Plaintiffs' claim that the purchase of Woods Wire I assets was a fraudulent transfer does not render the press release fraudulent.

According to the SAC, the 1993 press release stated: "Pentland USA acquired an 80% shareholding in [Woods Wire I]," that "Pentland's investment in [Woods Wire I] amounts to US $5 million in cash," and in addition "[Woods Wire I] has net borrowings of about US $35 million" and that "[Woods Wire I] will continue to operate from its present headquarters in Carmel, Indiana." "Its former owners, President and Chief Executive Alfred M. Stauder and Chief Operating Officer David Felts, will retain a 20% shareholding and will continue to manage the business under new service contracts."  SAC ¶ 115.  Plaintiffs claim that in the press release, "the Pentland Defendants . . . represented that the sale of [Woods Wire I]'s assets was a lawful arms' length transaction in which the fair market value was paid and that it did not prejudice or prefer any creditors or disregard any of their rights. . . ."  However, those are not the words of the press release, and cannot form the basis for a fraud claim under the facts as presented to the Court.

Plaintiffs' reliance on Kleiman's August 1993 letter on behalf of Woods Wire I to Atlantico's counsel also does not constitute a misrepresentation of past or existing fact made by a Pentland Defendant to Atlantico.  The letter is simply not a communication from the Pentland Defendants.

Plaintiffs also argue that they have properly alleged constructive fraud and contend that in Indiana, fraud is a "flexible concept" that "'is better left undefined.'"  Pl.'s Resp. Br. 18 (quoting

27

*Daly v. Showers*, 8 N.E.2d 139, 142 (Ind. Ct. App. 1937)).  However, fraud is not as nebulous a concept as Plaintiffs would like.  To state a claim for constructive fraud, Plaintiffs must allege 1) a duty existing by virtue of the relationship between the parties; 2) representations or omissions made in violation of that duty; 3) reliance thereon by the complaining party; 4) injury to the complaining party as a proximate result thereof; and 5) the gaining of an advantage by the party charged at the expense of the complaining party.  *See Morgan Asset Holding Corp. v. CoBank, ACB*, 736 N.E.2d 1268, 1273 (Ind. Ct. App. 2000).  A duty of disclosure is imposed only if a fiduciary / confidential relationship or other "special relationship" exists between the parties.  *Id.*  The SAC reveals that the Pentland Defendants were not in any relationship, let alone a fiduciary / confidential relationship or other "special relationship," that triggered any duty.  The loans were extended to Corelmex, an entity with no affiliation to the Pentland Defendants at a time when Pentland had nothing to do with Woods Wire I.  *See* SAC ¶¶ 36-39.

Plaintiffs' contention that the Pentland Defendants are liable for fraud "based on the principles of agency" is equally flawed.[11]  Plaintiffs contend that Stauder, Felts, and Woods Wire I acted with the Pentland Defendants' actual and apparent authority.  Actual authority is created "by written or spoken words or other conduct of the principal, which, reasonably interpreted, causes the

---

[11]  Plaintiffs have filed a notice of supplemental authority without seeking leave of the Court to do so.  The Court advises all parties to abide by Local Rules.  Parties must seek leave to submit supplemental filings as well as oversized pleadings.

Plaintiffs presented recent authority from this Court, *Indiana Bell Telephone Co., Inc. v. Thrifty Call Inc.*, IP02-C-0170-H/K, 2005 WL 1528239 (S.D. Ind. June 24, 2005), for the proposition that a defendant can be held liable for fraud even though it did not make any representation to or communicate with the plaintiffs as long as the misrepresentations were made by agents or conspirators of the defendant.  But as discussed, Plaintiffs have not alleged actual or apparent agency.  Accordingly, this additional authority does not provide the Court with any guidance regarding this dispute.

agent to believe that the principal desires him to so act on the principal's account." *See Mendard, Inc. v. Dage-MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind. 2000).  Plaintiffs merely conclude, without explanation or citation to the SAC, that the Pentland Defendants represented to Atlantico that they desired Stauder, Felts, or Woods Wire I to act on their account.  Moreover, the alleged misrepresentations to Atlantico occurred from 1987 to 1992, long before the Pentland Defendants had acquired any Woods Wire I assets and even before they had any involvement with Stauder, Felts, or Woods Wire I.[12]

Plaintiffs' claim of apparent authority also fails.  Apparent authority "refers to a third party's reasonable belief that the principal has authorized the acts of its agent; it arises from the principal's indirect or direct manifestations to a third party and not from the representations or acts of the agent. *Gallant Ins. Co. v. Isaac*, 751 N.E.2d 672, 675 (Ind. 2001).  Apparent authority requires a representation from the principal to the third party indicating the agent's apparent authority.  *See Menard*, 726 N.E.2d at 1210 (internal quotation omitted).  Plaintiffs have made no such allegation in the SAC.  In fact, Plaintiffs do not even allege contact between Atlantico and the Pentland Defendants during the relevant period.  Plaintiffs' apparent authority argument fails because there are no facts under which it can sustain its claim.  Accordingly, the Court **GRANTS** the Pentland Defendants' motion to dismiss with prejudice Count X as to all Pentland Defendants.

---

[12]  Plaintiffs' *respondeat superior* arguments fail for the same reason – when the misrepresentations were allegedly made, Stauder, Felts, and Woods Wire I were not employees of, or affiliated with, the Pentland Defendants.

## IV.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** in part and **DENIES** in part, Defendants'

Motions to Dismiss as follows:

Regarding the joint motion to dismiss, the Court:

> **GRANTS** the motion to dismiss with prejudice Count X against all defendants, to the extent that such claims are based upon the execution of guarantees by Woods Wire I in 1988 and 1989 for Corelmex debt;
> **GRANTS** the motion to dismiss with prejudice all remaining fraud and fraud-based claims as to all defendants, to the extent that they are based on the execution of guarantees by Woods Wire I in 1988 and 1989 for Corelmex debt; and
> **GRANTS** the motion to dismiss with prejudice Counts I-VI, VIII.

Regarding the Stauder Defendants' motion to dismiss, the Court:

> **DENIES** the motion to dismiss Count VII;
> **GRANTS** the motion to dismiss with prejudice Counts X and IX as to ITS, Mrs. Stauder, Pacintrex, and Longwood; and **DENIES** the motion to dismiss as to Stauder, Felts, and Anonymous II (f/k/a Woods Wire I); and
> **DENIES** the motion to dismiss Count XI.

Regarding Woods' motion to dismiss, the Court:

> **DENIES** the motion to dismiss Counts VII, IX, X, XI, and XII.

Regarding the Pentland Defendants' motion to dismiss, the Court:

> **DENIES** the motion to dismiss Count VII; and
> **GRANTS** the motion to dismiss with prejudice Count X as to all Pentland Defendants.

IT IS SO ORDERED this 11th day of August, 2005.

LARRY J. McKINNEY, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

30

Electronically distributed to:

Mariana Teresa Acevedo
KELLEY DRYE & WARREN LLP
macevedo@kelleydrye.com

Barry S. Alberts
SCHIFF HARDIN LLP
balberts@schiffhardin.com

Michael J. Andreoli
DONALDSON ANDREOLI & TRUITT
mandreoli@datlaw.com

Jeff M. Barron
BARNES & THORNBURG LLP
jeff.barron@btlaw.com

Cory Stephen Brundage
cb@brundagelaw.com

Amy Marlyse Burgert
MAYER BROWN ROWE & MAW LLP
aburgert@mayerbrownrowe.com

James Braden Chapman II
DANN PECAR NEWMAN & KLEIMAN
jchapman@dannpecar.com

Jeffrey Michael Cromer
DANN PECAR NEWMAN & KLEIMAN
jcromer@dannpecar.com

Paul F. Doyle
KELLY DRYE & WARREN
pdoyle@kelleydrye.com

Robert Ehrenbard
KELLEY DRYE & WARREN
rehrenbard@kelleydrye.com

Daniel C. Emerson
BOSE MCKINNEY & EVANS, LLP
demerson@boselaw.com

Donald E. Knebel
BARNES & THORNBURG LLP
donald.knebel@btlaw.com

Mark E. McGrath
KELLEY DRYE & WARREN LLP
mmcgrath@kelleydrye.com

Jonathan G. Polak
DANN PECAR NEWMAN & KLEIMAN
jpolak@dannpecar.com

C. Joseph Russell
BOSE MCKINNEY & EVANS, LLP
crussell@boselaw.com

James Emmett Tancula
MAYER BROWN ROWE & MAW
jtancula@mayerbrownrowe.com

Philip A. Whistler
ICE MILLER
philip.whistler@icemiller.com

Bradley L. Williams
ICE MILLER
williamb@icemiller.com

Judy L. Woods
BOSE MCKINNEY & EVANS, LLP
jwoods@boselaw.com